IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ECOPRODUCT SOLUTIONS, L.P. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 08-cv-06 |
| | § | |
| TETRA TECHNOLOGIES, INC. | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff EcoProduct Solutions, L.P. ("EcoProduct") files this First Amended Complaint against Defendant Tetra Technologies, Inc. ("Tetra") and alleges:

## PARTIES

1. Plaintiff EcoProduct is a Texas limited partnership that has its principal executive offices in Houston, TX.

2. Defendant Tetra is a Delaware corporation that has its principal executive offices in The Woodlands, TX. Tetra has been served with process and appeared in this action.

## JURISDICTION

3. This action arises under the antitrust laws of the United States, Title 15 United States Code. Jurisdiction is proper under 15 U.S.C. § 15 and 28 U.S.C. § 1331.

4. Tetra does business in this State and District and has sufficient contacts to subject it to the personal jurisdiction of this Court for this antitrust action. Tetra's principal executive offices are located in this State and District, and is selling and offering to sell, and has within a reasonable period prior to the filing of this action, sold and offered to sell its products to consumers in this State and in this District. Tetra has

placed its products into the stream of commerce, knowing or reasonably expecting that such products will be used, sold, or offered to be sold in this State and in this District. Tetra has intentionally established distribution channels to offer its products for sale and to sell its products in this State and in this District.

## VENUE

5.  Venue is proper in this Court under 15 U.S.C. § 22 because Tetra is an inhabitant of this District and transacts business in this District. In addition, venue is proper in this Court under 28 U.S.C. §§ 1391(b)-(c) because (i) Tetra resides in this District and (ii) a substantial part of the events or omissions giving rise to the claims against Tetra occurred in this District.

## FACTS

6.  This is an action for predatory pricing in violation of 15 U.S.C. § 2 (the "Sherman Act") and 15 U.S.C. § 13(a) (the "Robinson-Patman Act").

7.  According to Tetra's own internet website, it is the "world's largest, vertically integrated producer, marketer, and distributor of calcium chloride, which it supplies as feedstocks—along with its brominated products—for its completion fluids business as well as for applications in a variety of other markets."

8.  By way of explanation, calcium chloride is a unique product that (in all geographic areas relevant here) is used for two primary purposes. First, in both onshore and offshore oil and gas well servicing, calcium chloride is used as a "completion fluid," which means a fluid used during the completion of a well to maintain pressure in the well shaft sufficient to prevent hydrocarbons from "gushing" upwards out of the formation. In this regard, completion fluid serves a similar purpose to what "drilling mud" does during

the drilling stage, but it is far superior to drilling mud at the completion stage because, unlike drilling mud, clear fluids do not contain solids that can clog the pores of the formation.  Naturally, completion fluid must exceed a particular density to fulfill its purpose, and the specific density requirement in any given situation varies depending on factors such as formation pressure and sub-sea temperature.  For situations where calcium chloride's density is sufficient, there are no liquid products as or more dense than calcium chloride that are not also cost prohibitive.  Calcium bromide, for example, is generally many multiples more expensive than calcium chloride.  Second, calcium chloride is used in high volumes for road maintenance and de-icing.  There are not any suitable replacement products for calcium chloride in this context either.  Traditionally, salt was used in this context.  However, salt does not work as an ice-melter in temperatures lower than 24 degrees, and salt is also far more corrosive.  Further, there is no economically feasible product in the relevant market(s) with the comparable dust-control qualities as calcium chloride.

      9.    For several years and, in any event, all times relevant hereto, Tetra has been the dominant calcium chloride manufacturer/seller in the southern United States.[1]  Tetra had no significant competitor in any of the southern United States in the "end user" sale and distribution market at least until 2006.  For purposes of this pleading, "end users" are intended to at least include well servicing companies that use calcium chloride

---

[1] The "southern United States," for purposes of this Complaint, include Texas, Louisiana, Mississippi, Alabama, Florida, Georgia, South Carolina, North Carolina, Tennessee, Arkansas, Oklahoma, Kansas, Missouri, and Nebraska.  The dominant calcium choride manufacturer/seller in the "northern United States" (which, for purposes of this Complaint, include Minnesota, Wisconsin, Michigan, Illinois, Iowa, Indiana, Kentucky, Virginia, West Virginia, Ohio, Pennsylvania, Maryland, Delaware, New Jersey, New York, Connecticut, Rhode Island, Vermont, Massachusetts, New Hampshire, and Maine) has been, at all relevant times, third party Dow Chemical Co. ("Dow").

in connection with providing services for their oil and gas production clients, and also large road de-icing/dust-control operators and dealers.

10. Calcium chloride, due to its density, is subject to unusually high transportation costs and can be transported most efficiently by barge. For example, while a single truckload typically holds 22 tons of product, and a railcar holds 95 tons of product, a barge can efficiently move <u>1,500 tons or more</u>. Therefore, while Tetra has dominated the entire southern United States as defined herein, any truly "relevant market" for this product would necessarily encompass a narrower geographic area and be shaped both by distance and natural waterways. Here, the relevant market includes the combined geographic area that is situated to access (via barge shipment with little or no land transport) the enormous supply of calcium chloride that happens to be produced in Southeast Louisiana: i.e., (1) the strip of land along the Gulf Coast located on or near the Intercoastal Canal; plus (2) the strip of land along the Mississippi River up to Missouri. However, Plaintiff also pleads expressly and in the alternative that the "relevant market(s)" include any and all areas borne out by the evidence that encompass any part of the Intercoastal Canal and/or the southern Mississippi River, including the "Gulf Coast" states, the "southern United States," or any subset(s) thereof.

11. In the market or markets relevant here, calcium chloride is made by neutralizing hydrochloric acid. To do so for commercial purposes requires an inexpensive source of hydrochloric acid which, as a practical matter, exists only when hydrochloric acid is a byproduct from another commercial activity and would have to be neutralized for disposal purposes anyway. For this reason, by far the largest source of salable calcium chloride in the southern United States (at 180,000 tons per year) is the

Baton Rouge, Louisiana refrigeration manufacturing facility of Honeywell International Inc. ("Honeywell"). Before EcoProduct came along, Tetra controlled this and all other supply in the market relevant to this lawsuit, except for approximately 50,000-75,000 tons per year produced by BJ Services Company (which is devoted largely, if not entirely, for BJ Services' own use).

12.    In 2006, Plaintiff EcoProduct sought to enter the calcium chloride market to compete with Tetra (including in the "end user" sale and distribution market). EcoProduct's business plan was to obtain calcium choride to sell and distribute both from third party suppliers and from its own conversion facility in Louisiana. As described in more detail below, EcoProduct succeeded in contracting for the byproduct supply generated by third party Honeywell. Unfortunately, EcoProduct's own "conversion facility" -- which it actually built as a sub-plant at the manufacturing facility of Syngenta Crop Protection, Inc. in St. Gabriel, Louisiana -- suffered technical failures and, on October 16, 2007, Syngenta's counsel sent EcoProduct a letter stating that the project was terminated and EcoProduct could no longer access the premises.[2]  Even without any supply from the St. Gabriel facility, the substantial supply from Honeywell would, under normal circumstances, be more than enough to enable EcoProduct to compete with Tetra.

13.    Tetra quickly learned that EcoProduct had outbid Tetra for the Honeywell supply and would therefore pose a legitimate competitive threat to Tetra. In response, shortly before EcoProduct "took over" the Honeywell supply in early 2007, Tetra began a predatory pricing scheme designed to drive EcoProduct out of the market. It is important to understand that, while this market also includes many small customers, only a few

---

[2]  The "Syngenta" conversion sub-plant was expected to create an additional 120,000 tons per year of supply, but obviously that supply does not now exist.

large customers can actually consume the supply in the high-volume "barge quantities" by which the product can be economically transported from the source.  In other words, the overwhelming majority of the volume in this market is inevitably sold to a small number of customers.  Since EcoProduct actually gained access to a meaningful amount of the supply in this market, it would normally be able to compete for the business of those few important, large customers.  However, Tetra understood the following realities:

    (a)    it could drive EcoProduct out of the market by selling below its costs only to three of these few large customers;[3]  and

    (b)    when EcoProduct is indeed driven out of the marketplace, Tetra would regain its stronghold on <u>all</u> of the relevant supply and sell to all customers at supracompetitive prices.

Tetra, therefore, began to sell calcium chloride to three of the four most significant end user purchasers in this region – including A.E.P. Environmental, L.L.C. (d/b/a "Ambar"), Baroid Industrial Drilling Products ("Baroid"), and Scotwood Industries, Inc. ("Scotwood") – at prices well below fair market value and, indeed, below Tetra's own supply costs.  The prices charged to customers such as Ambar and Baroid were at or around $44 per ton of calcium chloride, far below $75-90 fair market value prices for end users in this region for which Tetra previously sold the same product to these same customers.  Even more importantly, as described below, the $44 per ton figure is also below Tetra's average variable cost of supply.

    14.    When Tetra agreed to sell and began to sell calcium chloride at the below-market prices discussed in the preceding paragraphs, it was aware that such prices would actually be lower than its supply costs.  This is because, given the large quantity of product that Tetra obligated itself to supply at the $44 per ton level, it has by necessity

---

[3]  All of whom Tetra had previously supplied using calcium chloride obtained from the Honeywell plant.

obtained a significant portion from sources in the <u>northern</u> United States which, given the transportation costs discussed above, would and has cost Tetra as much as $90 per ton of supply, more than twice as much as Tetra is selling it for to Ambar and Baroid. In fact, Tetra has taken the virtually unprecedented step of turning to third party Dow (the aforementioned dominant calcium chloride manufacturer/seller in the northern United States) for a significant amount of its supply to be transported and sold in the <u>southern</u> United States. The substantial tonnage that Tetra is acquiring at an increased cost but selling at a lower price makes clear that Tetra's average variable cost (in fact, their cost of goods plus transport cost alone) exceeds the $44 per ton for which it is selling such calcium chloride. From the outset, Tetra has openly and brazenly stated to third parties that it was pricing its calcium chloride below cost specifically to drive EcoProduct out of the calcium chloride business. In fact, even in the short period of time since the filing of EcoProduct's Original Complaint, Tetra has emphatically told many of EcoProduct's customers and potential customers that EcoProduct would be out of business by year end 2007, and has specifically told at least one third party that Tetra would regain the Honeywell supply by year end 2007.

15. Tetra continues to lose significant amounts of money under these below-cost pricing agreements – consistent with that fact, its announced 2Q 2007 earnings were 22 percent lower than the same period a year ago. However, Tetra has done so because of its (justified) belief that it will recoup such losses after EcoProduct is driven out of the business. For its part, EcoProduct has lost over $2 million in this business since February, 2007, and EcoProduct will inevitably continue to lose money as long as Tetra is able to absorb losses from its predatory pricing. Tetra itself has widely predicted to

EcoProduct's customers that EcoProduct will not survive beyond the end of this year. Indeed, unable to compete with the significantly below-cost prices charged by Tetra, EcoProduct's recurring storage costs for excess supply have grown to the point that EcoProduct would literally be better off dumping its product into the river (if, of course, such a thing were legal). Currently, EcoProduct's storage costs caused by Tetra's scheme are approximately $130,000 per month.

16. Assuming EcoProduct goes out of business, Tetra will no doubt monopolize the market again because any hypothetical new entrant to this calcium chloride market would face two unique barriers to entry. First, there simply are no additional, economically feasible sources of supply. When EcoProduct goes out of business, Tetra will obtain the Honeywell supply and lock it up with a long-term contract. This has been acknowledged by both Honeywell and Tetra, and will be easily confirmed by the evidence. Second, even if a hypothetical third party that somehow acquired Honeywell's supply (or Honeywell itself) tried to enter the market on its own, it would have to acquire and/or build, among other things, tank facilities to store and load such product onto barges on the Mississippi River.[4] This, if not entirely cost prohibitive, would at a minimum take more than enough time for Tetra to recoup its losses via supracompetitive pricing. Put simply, Tetra's predatory pricing scheme poses a dangerous probability of driving EcoProduct out of the market, and Tetra could then raise prices long enough to recoup its losses without drawing new entrants to the market.

17. Of course, Tetra is not charging below-market prices to all of its customers. Rather, it is discriminating between (i) large purchasers who would otherwise

---

[4] As has been alleged, the extremely high transportation costs for this product requires any feasible market entrant to have access to such a facility located both close to the physical supply source and on a large body of water such as the Mississippi River or Intercoastal Canal.

be prime candidates to purchase from EcoProduct (i.e., purchasers that are physically set up for delivery by barge); and (ii) purchasers who would not otherwise be prime candidates to purchase significant amounts of EcoProduct's supply. Since the latter group is not critical to Tetra's objective of driving EcoProduct out of business and regaining the Honeywell supply, it continues to be charged market prices for commodity of the like grade and quality that is being sold for below-cost prices to other purchasers. This scheme has the effect of substantially lessening competition and tends to create and/or perpetuate a monopoly in this line of commerce.

## CAUSES OF ACTION

A.  **Monopolization or Attempting to Monopolize Under 15 U.S.C. § 2 (the "Sherman Act")**

18. The facts alleged above are incorporated into this cause of action as if fully set forth herein.

19. Tetra has monopolized or attempted to monopolize part of interstate commerce (namely, the calcium chloride sale and distribution business in the relevant market(s) alleged herein).

20. Tetra is charging prices for calcium chloride that are below any reasonable and appropriate measure of its costs.

21. Tetra's predatory pricing poses a dangerous probability of actual monopolization and Tetra's recouping the losses from such below-cost pricing by (a) driving EcoProduct out of the market; and (b) raising prices to consumers long enough to recoup Tetra's costs without drawing new entrants to the market.

22. Tetra's predatory pricing scheme has proximately caused and continues to proximately cause injury to EcoProduct.

B.  **Primary-Line Price Discrimination In Contravention of Competition Under 15 U.S.C. § 13(a) (the "Robinson-Patman Act")**

23. The facts alleged above are incorporated into this cause of action as if fully set forth herein.

24. Tetra has discriminated in price between different purchasers of calcium chloride (of like grade and quality) sold for use or consumption within the United States. The price being charged to purchasers who would otherwise be prime candidates to purchase from EcoProduct (i.e., purchasers that are physically set up for delivery by barge) is below any reasonable and appropriate measure of Tetra's costs.

25. The effect of such price discrimination is, at a minimum, reasonably likely to substantially lessen competition in the calcium chloride sale and distribution business in the relevant market(s) alleged herein and tends to create and/or perpetuate a monopoly in such market(s).  Moreover, such price discrimination is not based on the due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered; nor has the price discrimination occurred in good faith to meet an equally low price of any competitor of Tetra's.

26. Tetra's predatory pricing poses, at a minimum, a reasonable possibility of substantial injury to competition and Tetra's recouping the losses from such below-cost pricing by (a) driving EcoProduct out of the market; and (b) raising prices to consumers long enough to recoup Tetra's costs without drawing new entrants to the market.

27. Tetra's predatory price discrimination scheme has proximately caused and continues to proximately cause injury to EcoProduct.

## RELIEF

28. Plaintiff respectfully requests the following relief:

a. that the Court award actual damages to EcoProduct against Tetra in an amount to be proven at trial;

b. that the Court award threefold damages, the cost of suit (including a reasonable attorney's fee), and interest pursuant to 15 U.S.C. § 15;

c. that the Court award such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

29. EcoProduct has demanded a trial by jury as to all issues triable by a jury.

Respectfully submitted,

By: /s/ Jean C. Frizzell
  Jean C. Frizzell
  T.B.A. No. 07484650
  GIBBS & BRUNS, L.L.P.
  1100 Louisiana, Suite 5300
  Houston, Texas   77002
  Telephone: (713) 650-8805
  Facsimile: (713) 750-0903

**ATTORNEY-IN-CHARGE FOR PLAINTIFF ECOPRODUCT SOLUTIONS, L.P.**

Of Counsel:
  John Scott Black
  T.B.A. No. 24012292
  Brian T. Ross
  T.B.A. No. 24037395
  GIBBS & BRUNS, L.L.P.
  1100 Louisiana, Suite 5300
  Houston, Texas   77002
  Telephone: (713) 650-8805
  Facsimile: (713) 750-0903

CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document was served upon all counsel by email pursuant to the Court's ECF System on the 11th day of January, 2008, as set forth below:

Layne E. Kruse
Edward J. Patterson
Darryl W. Anderson
Fulbright & Jaworski, L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010
Counsel for Defendant Tetra Technologies, Inc.

      By:___/s/ Brian T. Ross_____